# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| PETER FAGAN, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:24-cv-466 |
| | § | Judge Mazzant |
| NEXO CAPITAL INC. AND | § | |
| ANTONI TRENCHEV, | § | |
| | § | |
| *Defendants.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendant's Motion to Dismiss on *Forum Non Conveniens* Grounds or in the Alternative Motion to Transfer to the Northern District of Texas, Fort Worth Division, Pursuant to 28 U.S.C. § 1404 (Dkt. #5). Also pending before the Court is Defendants' Motion to Dismiss Antoni Trenchev Pursuant to Rule 12(b)(2) and Motion to Dismiss Pursuant to Rule 12(b)(6) (Dkt. #6). Having considered the Motion, the relevant pleadings, and the applicable law, the Court finds as follows:

1. Defendant's Motion to Dismiss on *Forum Non Conveniens* Grounds or in the Alternative Motion to Transfer to the Northern District of Texas, Fort Worth Division, Pursuant to 28 U.S.C. § 1404 (Dkt. #5) should be **DENIED**; and

2. Defendants' Motion to Dismiss Antoni Trenchev Pursuant to Rule 12(b)(2) and Motion to Dismiss Pursuant to Rule 12(b)(6) (Dkt. #6) should be **GRANTED in part** and **DENIED in part.**

## BACKGROUND

This case involves the alleged misappropriation of millions of dollars of funds that Plaintiff Dr. Peter Fagan ("Dr. Fagan") stored in a cryptocurrency account operated by Defendant Nexo

Capital, Inc. ("Nexo"). The questions that the Court must answer in this Order relate to jurisdiction, venue, and pleading sufficiency.

## I.    Factual Background

Dr. Fagan is an occupational medicine specialist residing in Comanche County, Texas (Dkt. #2 at ¶¶ 1, 9, 3). Nexo is a Cayman Islands corporation that operates a cryptocurrency platform (Dkt. #2 at ¶ 10). Defendant Antoni Trenchev ("Trenchev") co-founded Nexo and resides in the United Arab Emirates (Dkt. #2 at ¶ 11).

In February of 2021, Dr. Fagan opened a cryptocurrency account with Nexo and enrolled in its "Earn Interest Product" ("EIP") (Dkt. #2 at ¶ 51). The EIP allowed investors to tender cryptocurrency assets to Nexo (Dkt. #2 at ¶ 36). In turn, Nexo would deposit those assets into interest-yielding accounts (Dkt. #2 at ¶ 36). In total, Dr. Fagan deposited more than $2 million worth of cryptocurrency into his Nexo account under fixed-term EIP agreements (Dkt. #2 at ¶ 69). These fixed terms were periodically auto renewed through February 2023 (Dkt. #2 at ¶ 56).

As it turns out, Nexo did not act entirely above board. In January of 2023, the United States Securities and Exchange Commission ("SEC") issued a Cease-and-Desist Order against Nexo after an investigation revealed that Nexo, through its EIP, was selling unregistered securities (Dkt. #2 at ¶¶ 31, 49). The SEC Order required Nexo to, among other things, pay $22.5 million in fines to the SEC and cease its EIP offering as to all United States investors by April 1, 2023 (Dkt. #2 at ¶ 49). As the April 1 deadline approached, some time in late January or early February, Nexo informed Dr. Fagan that it was ceasing operations in Texas and, therefore, Dr. Fagan would be required to transfer all funds out of his Nexo account by April 1, 2023 (Dkt. #2 at ¶ 52). According to Dr. Fagan, well before the April 1 deadline, he began taking steps to withdraw his account balance

(Dkt. #2 at ¶¶ 52–60). Despite multiple attempts Dr. Fagan was never able to access his account due to issues with Nexo's two-factor authentication (Dkt. #2 at ¶ 60). During that time, Nexo's customer service department repeatedly assured Dr. Fagan that "everything is in order" (Dkt. #2 at ¶¶ 54, 62). In fact, it was not.

On March 15, 2023—while Dr. Fagan still could not access his account—Nexo sent him an email entitled "Update for Clients from Texas" (Dkt. #2 at ¶ 64). The email warned Texas clients to "begin planning the withdrawal of [their] funds at a convenient time" by April 1 (Dkt. #2 at ¶ 64). Dr. Fagan continued to try to access his account over the next two weeks but was denied access at every turn (Dkt. #2 at ¶ 66). Consequently, Dr. Fagan began to fear that there was an "internal theft" of his account, whereby his account was "totally frozen . . . while [his] funds [we]re being stolen" (Dkt. #2-17). As it turns out, Dr. Fagan's suspicions were confirmed. According to his Complaint, between February 28 and March 20, 2023—the period in which Dr. Fagan was unable to access his account—seventeen withdrawals were made from his account without his authorization (Dkt. #2 at pp. 21–22). All in all, Dr. Fagan had $2,090,324.34[1] in assets transferred from his Nexo account (Dkt. #2 at pp. 21–22).

On March 20, 2023, Dr. Fagan received a notice from a Nexo employee stating that Nexo had "identified reasonable grounds to terminate [its] business relationship" with Dr. Fagan (Dkt. #2 at ¶ 72). The notice demanded that Dr. Fagan withdraw his remaining assets within fifteen days, after which his account would be permanently closed (Dkt. #2 at ¶ 72). For months after that notice, Dr. Fagan unsuccessfully attempted to contact Nexo to regain access to his account (Dkt. #2 at ¶¶ 73–77). It was not until May of 2023, after he had engaged an attorney, that Nexo finally

---

[1]  Dr. Fagan claims that the assets stolen from his account are now worth nearly $4 million (Dkt. #2 at ¶ 81).

granted Dr. Fagan access to his account (Dkt. #2 at ¶¶ 75–76). He was greeted with an account balance that had almost entirely disappeared—from more than $2 million to barely more than $2,000 (Dkt. #2 at ¶¶ 76–77, 79, 81).

## II.    Procedural History

On May 22, 2024, Dr. Fagan filed his Original Complaint against Defendants, asserting claims for conversion, violations of the Texas Theft Liability Act, the Exchange Act (15 U.S.C. § 78j(B)), the Texas Securities Act (TEX. GOV'T CODE § 4008.051(A)), and the Electronic Funds Transfer Act ("EFTA"), common law fraud, money had and received, negligence, unjust enrichment, and constructive trust (Dkt. #2 at ¶¶ 86–144). On August 26, 2024, Defendants moved to dismiss Dr. Fagan's Complaint on *forum non conveniens* grounds ("FNC Motion") or, alternatively, to transfer this action to the Northern District of Texas, Fort Worth division, pursuant to 28 U.S.C. § 1404 (Dkt. #5). Defendants also filed a motion to dismiss under Rules 12(b)(2) and 12(b)(6) for lack of personal jurisdiction over Trenchev and for failure to state a claim (Dkt. #6). On October 7, 2024, Dr. Fagan filed Responses to both motions (Dkt. #16; Dkt. #17). Defendants replied on November 11, 2024 (Dkt. #25; Dkt. #26). On November 18, 2024, Dr. Fagan filed Sur-Replies (Dkt. #27; Dkt. #28).

## LEGAL STANDARD

## I.    Federal Rule of Civil Procedure 12(b)(2)

Federal Rule of Civil Procedure 12(b)(2) requires a court to dismiss a claim if the court does not have personal jurisdiction over the defendant. FED. R. CIV. P. 12(b)(2). After a non-resident defendant files a motion to dismiss for lack of personal jurisdiction, it is the plaintiff's burden to establish that *in personam* jurisdiction exists. *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990) (citing *WNS, Inc. v. Farrow*, 884 F.2d 200, 203 (5th Cir. 1989)). To satisfy that burden, the party

seeking to invoke the court's jurisdiction must "present sufficient facts as to make out only a *prima facie* case supporting jurisdiction,*"* if a court rules on a motion without an evidentiary hearing. *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000). When considering the motion to dismiss, "[a]llegations in [a] plaintiff's complaint are taken as true except to the extent that they are contradicted by [a] defendant's affidavits." *Int'l Truck & Engine Corp. v. Quintana*, 259 F. Supp. 2d 553, 557 (N.D. Tex. 2003) (citing *Wyatt v. Kaplan*, 686 F.2d 276, 282–83 n.13 (5th Cir. 1982)); *accord Black v. Acme Mkts., Inc.*, 564 F.2d 681, 683 n.3 (5th Cir. 1977). Further, "[a]ny genuine, material conflicts between the facts established by the parties' affidavits and other evidence are resolved in favor of plaintiff for the purposes of determining whether a *prima facie* case exists." *Id.* (citing *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992)). However, if a court holds an evidentiary hearing, a plaintiff "must establish jurisdiction by a preponderance of the admissible evidence." *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 585 (5th Cir. 2014) (citing *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241–42 (5th Cir. 2008)).

A court conducts a two-step inquiry when a defendant challenges personal jurisdiction. *Ham v. La Cienega Music Co.*, 4 F.3d 413, 415 (5th Cir. 1993). First, absent a controlling federal statute regarding service of process, the court must determine whether the forum state's long-arm statute confers personal jurisdiction over the defendant. *Id.* Second, the court establishes whether the exercise of jurisdiction is consistent with due process under the United States Constitution. *Id.*

The Texas long-arm statute confers jurisdiction up to the limits of due process under the Constitution. *Command-Aire Corp. v. Ont. Mech. Sales and Serv. Inc.*, 963 F.2d 90, 93 (5th Cir. 1992) (citing *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370 (5th Cir. 1987)). Therefore, the sole inquiry that

remains is whether personal jurisdiction offends or comports with federal constitutional guarantees. *Bullion*, 895 F.2d at 216. The Due Process Clause permits the exercise of personal jurisdiction over a non-resident defendant when the defendant has established minimum contacts with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  Minimum contacts with a forum state can be satisfied by contacts that give rise to either general jurisdiction or specific jurisdiction. *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994).

General jurisdiction exists only when the defendant's contacts with the forum state are so "'continuous and systematic' as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see Cent. Freight Lines v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2003) (citing *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). Substantial, continuous, and systematic contact with a forum is a difficult standard to meet and requires extensive contacts between a defendant and the forum. *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).  "General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999) (citation omitted).  However, "vague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction." *Johnston*, 523 F.3d at 610 (citing *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 596 (5th Cir. 1999)).

Specific jurisdiction is proper when the plaintiff alleges a cause of action that grows out of or relates to a contact between the defendant and the forum state. *Helicopteros*, 466 U.S. at 414 n.8. The Court conducts a three-step inquiry to determine whether specific personal jurisdiction exists. *Jones v. Artists Rights Enf't Corp.*, 789 F. App'x 423, 425 (5th Cir. 2019). First, the Court asks, "whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there." *Id.* (quoting *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)). Second, the Court assesses "whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts." *Id.* (quoting *Seiferth*, 472 F.3d at 271). Third and finally, the Court considers "whether the exercise of personal jurisdiction is fair and reasonable." *Id.* (quoting *Seiferth*, 472 F.3d at 271).

In sum, a defendant who "'reach[es] out beyond one state and create[s] continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other state for the consequences of their actions." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950)). Establishing a defendant's minimum contacts with the forum requires contacts that are more than "random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *Id.*

"If the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Seiferth*, 472 F.3d 271. In this inquiry, the Court examines five factors: (1) the burden on the nonresident defendant; (2) the forum state's interests; (3) the plaintiff's interest in securing relief; (4) the interest of the interstate judicial system in the efficient administration of justice; and (5) the shared

interest of the several states in furthering fundamental social policies. *Burger King*, 471 U.S. at 477.

"It is rare to say the assertion of jurisdiction is unfair after minimum contacts have been shown."

*McFadin v. Gerber*, 587 F.3d 753, 760 (5th Cir. 2009) (quoting *Wien Air Alaska, Inc. v. Brandt*, 195

F.3d 208, 215 (5th Cir. 1999)).

## II.    Venue

### A.    Rules Governing Venue and Dismissal or Transfer for Improper Venue

Section 28 U.S.C. § 1391(b) provides, in relevant part, that venue is proper in:

> A judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; or (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

28 U.S.C. §§ 1391(b)(1)–(2).

If venue is not proper in the district or division where the case is filed, the case may be

dismissed under Federal Rule of Civil Procedure 12(b)(3). Alternatively, under 28 U.S.C. § 1406(a),

"[t]he district court of a district in which is filed a case laying venue in the wrong division or district

shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in

which it could have been brought." 28 U.S.C. § 1406(a). In deciding a challenge to venue, the Court

"must accept as true all allegations in the complaint and resolve all conflicts in favor of the

plaintiff." *Mayfield v. Sallyport Glob. Holdings, Inc.*, No. 6:16-CV-459, 2014 WL 978685, at *1 (E.D.

Tex. Mar. 5, 2014) (citing *Ambraco, Inc. v. Bossclip, B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009)).

However, where the forum selection clause points to a foreign or state forum rather than

another federal district, the proper analytical framework is *forum non conveniens*. "[T]he

appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through

the doctrine of *forum non conveniens*." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*,

571 U.S. 49, 60 (2013). The doctrine of *forum non conveniens* "enables a court to decline to exercise its jurisdiction if the moving party establishes that the convenience of the parties and the court and the interests of justice indicate that the case should be tried in another forum." *Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258, 268 (5th Cir. 2001).

###### B.    Enforceability of Forum Selection Clauses

When analyzing the enforceability of forum selection clauses "federal law applies . . . in both diversity and federal question cases." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007) (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974)). Federal law governs district courts' decisions "whether to give effect to the parties' forum-selection clause." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 32 (1988). Under federal law, forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972) ("*The Bremen*"). "'[T]he party claiming [unfairness] should bear a heavy burden of proof.'" *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 592 (1991) (quoting *The Bremen*, 407 U.S. at 17).

If the forum-selection clause is found to be reasonable, courts must then determine whether the causes of action arise under the forum selection clause. *Ginter ex rel. Ballard v. Belcher, Predergrast & Laporte*, 536 F.3d 439, 441 (5th Cir. 2008) (citing *Marinechance Shipping Ltd. v. Sebastian*, 143 F.3d 216, 222–23 (5th Cir. 1998)).

Additionally, courts must also determine whether the forum selection clause is mandatory or permissive. *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127 (5th Cir. 1994). "A party's consent to jurisdiction in one forum does not necessarily waive that party's right to have an action heard in a different forum." *City of New Orleans v. Mun. Admin. Serv., Inc.*, 376 F.3d 501, 504 (5th Cir. 2004);

accord *Caldas & Sons*, 17 F.3d at 127. "For a forum selection clause to be exclusive, it must go beyond establishing that a particular forum will have jurisdiction and must clearly demonstrate the parties' intent to make that jurisdiction exclusive." *City of New Orleans*, 376 F.3d at 504 (citing *Keaty v. Freeport Indonesia*, Inc., 503 F.2d 955 (5th Cir. 1974)).

When a party challenges venue, the court must therefore determine whether the action falls within one of the three categories in § 1391(b). *Id.* at 56. If it does, venue is proper in that district; if it does not, venue is improper in that district, and the Court must dismiss the case or transfer it pursuant to § 1406(a). *Id.* The presence of a forum selection clause in the parties' agreement giving rise to the transaction is irrelevant for purposes of determining whether venue is proper under § 1391(b). *Id.* As a result, "a case filed in a district that falls within § 1391 may not be dismissed under § 1406(a) or Rule 12(b)(3)." *Id.*

## C.    § 1404(a) Transfer

Section 1404 permits a district court to transfer any civil case "[f]or the convenience of parties and witnesses, in the interest of justice . . . to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to 'an individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). The purpose of § 1404 "is to prevent the waste 'of time, energy and money' and 'to protect the litigants, witnesses and the public against unnecessary inconvenience and expense . . .'" *Van Dusen*, 376 U.S. at 616 (quoting *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 27 (1960)).

The threshold inquiry when determining eligibility for transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been

filed," or whether all parties consent to a particular jurisdiction. *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*"). Once that threshold inquiry is met, the Fifth Circuit has held "[t]he determination of 'convenience' turns on a number of public and private interest factors, none of which can be said to be of dispositive weight." *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004).

The private interest factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) ("*Volkswagen II*").

The public interest factors include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *Id.* These factors are neither exhaustive nor exclusive, and no single factor is dispositive. *Id.*

The party seeking transfer of venue must show good cause for the transfer. *Id.* The moving party must show that the transferee venue is "clearly more convenient" than the transferor venue. *Id.* The plaintiff's choice of venue is not a factor in this analysis, but rather contributes to the defendant's burden to show good cause for the transfer. *Id.* at 315 n.10 ("[W]hile a plaintiff has the privilege of filing his claims in any judicial division appropriate under the general venue statute, § 1404(a) tempers the effects of the exercise of this privilege."). However, "when the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice

should be respected." *Id.* at 315. And while the multi-factor analysis is informative, ultimately, "the district court has broad discretion in deciding whether to order a transfer." *Balawajder v. Scott*, 160 F.3d 1066, 1067 (5th Cir. 1998) (quoting *Caldwell v. Palmetto State Sav. Bank*, 811 F.2d 916, 919 (5th Cir. 1987)).

### III.    Federal Rule of Civil Procedure 12(b)(6)

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen,* 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has

12

alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

## ANALYSIS

Defendants' Motions present three questions. First, whether Trenchev is subject to the Court's jurisdiction. Second, whether this Court is the proper forum for this litigation. Third and finally, whether the face of Dr. Fagan's Complaint alleges sufficient facts to escape dismissal. The Court's analysis proceeds in that order.

## I.    Personal Jurisdiction

The Court begins with question one: whether it has personal jurisdiction over Trenchev. Defendants present their personal jurisdiction argument as an alternative to their FNC and § 1404 Motions and ask that the Court address it "if and only if the Court denies" both Motions (Dkt. #6). But "motion[s] to dismiss for lack of personal jurisdiction 'must be considered by the district

court before other challenges . . . .'" *LMC Props., Inc. v. Prolink Roofing Sys., Inc.*, No. 23-11090, 2024 WL 4449421, at *5 (5th Cir. Oct. 9, 2024) (quoting *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994)); *see also Advanced EDR Sys., LLC v. Design Sols., Inc.*, No. A-07-CA-698-LY, 2008 WL 11415923 (W.D. Tex. Mar. 20, 2008) ("A court should not transfer a case without first establishing personal jurisdiction over a defendant.") (citing *Goldlawr v. Heiman*, 369 U.S. 463, 467–68 (1962) (Harlan, J., dissenting)) (citation modified). That principle, though practically prudent, is permissive. Indeed, the Court recognizes that it *could* transfer this case under § 1404 without first establishing personal jurisdiction over Trenchev. *See Advanced EDR Sys.*, 2008 WL 11415923, at *1 n.1 (citing *Koehring Co. v. Hyde Const. Co.*, 324 F.2d 295, 298 (5th Cir. 1963)). But "[g]iven the result of the Court's venue-transfer analysis, the Court must address [Trenchev's] motion to dismiss for lack of personal jurisdiction and prefers to establish it at the outset." *See id.*

In so establishing, the Court looks first to Dr. Fagan's Complaint. Dr. Fagan's jurisdictional allegations regarding Trenchev begin by grouping him with Nexo. He argues that Defendants, collectively, "marketed and sold products and services in Texas and to consumers in Texas" (Dkt. #2 at pp. 4–5). As to Trenchev, individually, Dr. Fagan's Complaint alleges that he is a co-founder and Managing Partner of the Nexo Group and a director of Nexo Capital, that Nexo Capital entered a Consent Order with the Texas State Securities Board on Trenchev's behalf, and that Trenchev "controls" Nexo and, therefore, is jointly and severally liable alongside Nexo under 15 U.S.C. § 78t, and TEX. GOV'T CODE § 4008.055(a) (Dkt. #2 at ¶¶ 16, 21, 107, 115). Dr. Fagan does not argue that Trenchev is subject to the Court's general jurisdiction (*See* Dkt. #17). Instead, he argues that the circumstances above constitute the minimum contacts necessary for the Court to exercise specific personal jurisdiction over Trenchev (Dkt. #17 at pp. 6–11). As explained below, the Court agrees.

14

As previously stated, the Texas long-arm statute confers jurisdiction to the limits of due process under the Constitution. *See Command-Aire Corp.*, 963 F.2d at 93. Therefore, the sole inquiry for the Court is whether personal jurisdiction offends or comports with federal constitutional guarantees. *See Bullion*, 895 F.2d at 216. Notwithstanding the relatively general nature of Dr. Fagan's jurisdictional allegations against Trenchev in his Complaint, Dr. Fagan attempts to set the record straight in his Response to Defendants' Motion to Dismiss (Dkt. #17). First, he argues that Trenchev's responsibility over the Nexo Group companies' day-to-day operations, including those in Texas, made him a "control person" within the Court's jurisdictional reach (Dkt. #17 at pp. 8–9). Second, he insists that Trenchev's signature on the settlement agreements that Nexo entered with the Texas State Securities Board and the Texas Department of Banking (the "Texas Settlements") warrant exercising jurisdiction over him (Dkt. #17 at pp. 8–9). Third, Dr. Fagan contends that "Nexo and Trenchev are alter egos and abuse Nexo's corporate form to perpetrate fraud as an unfair device to achieve inequitable results" (Dkt. #27 at pp. 5–6) (internal quotations omitted). Because the Court is persuaded by Dr. Fagan's first argument, it need not address the others.

Dr. Fagan's first basis for haling Trenchev into this Court focuses on his role at Nexo and purported status as Nexo's "control person" within the meaning of 15 U.S.C. § 78t, which reads:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally . . . unless the controlling person acted in good faith and did not directly or indirectly induce the acts constituting the violation or cause of action.

Section 78t "has been read liberally and its 'provisions were enacted to expand, rather than restrict the scope of liability under the securities laws.'" *Landry v. Price Waterhouse Chartered Accts.*, 715 F. Supp. 98, 102 (S.D.N.Y. 1989) (quoting *S.E.C. v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975)).

As the Fifth Circuit has recognized, federal regulations further clarify the requisite level of "control" that a person must exercise over another as follows:

> The term "control" . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

*G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957 (5th Cir. 1981) (quoting 17 C.F.R. § 230.405(f) (1979)); *see also McNamara v. Bre-X Minerals Ltd.*, 46 F. Supp. 2d 628, 635 (E.D. Tex. 1999). Critically, "[n]either this definition nor the statute appears to require participation in the wrongful transaction." *Id.* at 958. And while the precise legal standard governing control-person liability remains undecided, the Fifth Circuit has asked four disjunctive questions in determining whether control-person liability should attach. *Carlton v. Cannon*, No. CV H-15-012, 2016 WL 3959164, at *4 (S.D. Tex. July 22, 2016). The Fifth Circuit asks whether the defendant:

1. "had 'effective day-to-day control' of the corporation," *id.* (quoting *Cameron v. Outdoor Resorts of Am., Inc.*, 608 F.2d 187 (5th Cir. 1979), *modified on other grounds on panel reh'g*, 611 F.2d 105 (5th Cir. 1980) (per curiam));

2. "had 'the requisite power to directly or indirectly control or influence corporate policy,'" *id.* (quoting *Thompson*, 636 F.2d at 958);

3. "had 'actual power or influence over the controlled person,'" *id.* (quoting *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990)); or

4. "'actually exercised that power.'" *Id.* (quoting *Abbot v. Equity Grp., Inc.*, 2 F.3d 613, 620 (5th Cir. 1993); *Heck v. Triche*, 775 F.3d 265, 283 n.18 (5th Cir. 2014)).

Courts in this Circuit and others have held that a *prima facie* showing of control-person liability can serve as a basis for personal jurisdiction. *See McNamara*, 46 F. Supp. 2d at 636 ("[T]he Court has personal jurisdiction over any Defendant as to which the [p]laintiffs make a *prima facie* showing of control person liability."); *San Mateo Cnty. Transit Dist. v. Dearman, Fitzgerald & Roberts, Inc.*, 979 F.2d 1356, 1358 (9th Cir. 1992) (concluding that a plaintiff satisfies the standard for personal

jurisdiction by making a nonfrivolous allegation that the defendant is a controlling person); *Landry*, 715 F. Supp. at 102 (concluding that a plaintiff's *prima facie* showing of control person liability was sufficient for the court to exercise jurisdiction over the nonresident defendant); *Derensis v. Coopers & Lybrand Chartered Accts.*, 930 F. Supp. 1003, 1014 (D.N.J. 1996) ("Plaintiffs have made a prima facie showing that [defendants] are 'controlling persons' . . . . Consequently, [defendants] are subject to the jurisdiction of this court.").

Against that backdrop, the Court looks to the facts that Dr. Fagan alleges in support of his control-person jurisdictional theory. Dr. Fagan directs the Court to § 78t of the Exchange Act to argue that "Antoni Trenchev is a director and manager of Nexo Capital Inc." and "[i]n that capacity, he controls Nexo Capital Inc." (Dkt. #2 at pp. 29–30). In support, he cites to the Texas Consent Order for the proposition that "Trenchev is responsible for supervising day-to-day business activities of the Nexo Group companies" (Dkt. #2 at p. 4) (quoting Dkt. #2-5 at ¶ 6). Indeed, the Consent Order—which Trenchev entered into on Nexo's behalf—added that Trenchev's supervisory authority extended to "ensuring [Nexo's] compliance with applicable legislation, rules, and regulations" (Dkt. #2-5 at p. 5). As relevant here, that would include Texas legislation, rules, and regulations. Indeed, Dr. Fagan contends that, by virtue of Nexo's presence in Texas and the offering of its EIP to more than 5,700 Texans for over $70 million, Trenchev's compliance responsibilities included compliance with Texas regulations (Dkt. #17 at pp. 8–9). Dr. Fagan points to the Texas Consent Order, which outlines in considerable detail Nexo's noncompliance with Texas financial regulations—responsibilities that fall directly under Trenchev's control (Dkt. #17 at p. 7) (citing Dkt. #2-5 at pp. 4–12 (highlighting Nexo's extensive contacts with Texas, including its misrepresentations to Texas investors and response to

investigation by the Texas State Securities Board)). According to Dr. Fagan, because Trenchev oversaw regulatory compliance in Texas, Nexo's violations of Texas regulations are imputed to him (Dkt. #17 at pp. 6–11). In short, he called the regulatory shots for Nexo, including those in Texas, so says Dr. Fagan.

On these facts, the Court concludes that Dr. Fagan has satisfied his burden to make a *prima facie* showing that Trenchev had "effective day-to-day control" of Nexo and possessed "the requisite power to directly or indirectly control or influence" Nexo's regulatory policies. *Cameron*, 608 F.2d at 187; *Thompson*, 636 F.2d at 958. Accordingly, he has made a *prima facie* showing of control-person liability under § 78t. Thus, even though some courts have concluded that control-person liability alone cannot support the exercise of personal jurisdiction over a nonresident defendant,[2] the Court is satisfied that Dr. Fagan exercised a sufficient level of control over Nexo's regulatory misconduct in Texas to subject himself to the Court's jurisdiction. That is enough for the Court to exercise personal jurisdiction over him. *See McNamara*, 46 F. Supp. 2d at 636.

## II.    The Forum Selection Clause

Having determined that the Court may exercise personal jurisdiction over Trenchev, the Court turns to Defendants' next basis for dismissal: the doctrine of *forum non conveniens*. Defendants' FNC Motion relies on an alleged mandatory forum selection clause requiring any claims to be litigated in London, England (Dkt. #5 at pp. 6–20). Defendants claim that the forum selection clause mandates dismissal (Dkt. #5 at pp. 6–20). Dr. Fagan, of course, opposes (Dkt. #16

---

[2]    *See, e.g.*, *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 667 (6th Cir. 2005) ("The broad understanding of control person liability adopted by the securities laws cannot on its own support personal jurisdiction.").

at pp. 5–10). Before the Court can evaluate the merits of Defendants' FNC Motion, it must first lay out some background regarding the terms and conditions at the heart of this procedural dispute.

### A.    Earn Terms v. Service Terms

The parties dispute the nature and enforceability of the terms and conditions governing Dr. Fagan's Nexo account and his use of the platform. Defendants assert that Dr. Fagan's account is governed by the Nexo Earn Interest Product General Terms and Conditions ("Earn Terms") and the Nexo Services General Terms and Conditions ("Service Terms"), which were posted on Nexo's website (Dkt. # 5 at p. 11). Dr. Fagan alleges that the only terms that govern this litigation are the Earn Terms (Dkt. #16 at pp. 9–10). Defendants, however, contend that the Service Terms control (Dkt. #25 at pp. 3–4).

The distinction between the Earn Terms and the Service Terms is critical to determining the enforceability of the forum selection clause. On February 19, 2021 (the date that Dr. Fagan opened his Nexo account) the Earn Terms contained the following forum selection clause:

> Any dispute arising out of or in connection with the Agreement . . . shall be referred to the competent court or other dispute resolution authority, determined as per the procedural law of Nexo jurisdiction.

(Dkt. #5-3 at p. 8). Defendants do not dispute the inclusion of the above clause in the Earn Terms when Dr. Fagan joined the platform (Dkt. #5-2 at ¶ 6) (citing Dkt. #5-3). They do, however, insist that the Service Terms govern this dispute, instead of the Earn Terms (Dkt. #25 at pp. 3–4). When Dr. Fagan created his Nexo account, the Service Terms provided that "[a]ny dispute arising out of or in connection with the Agreement . . . shall be referred to the competent court in London, England, determined as per the procedural law of England and Wales" (Dkt. #8-1 at p. 15). Thus, Defendants urge the Court to enforce the forum selection clause and dismiss this action pursuant to *forum non conveniens* so that it may be properly litigated in London (*See* Dkt. #5; Dkt. #25).

19

The Court agrees with Dr. Fagan that the Earn Terms govern this dispute. Dr. Fagan's allegations relate exclusively to money that he is allegedly owed under Nexo's EIP (*See generally* Dkt. #2). He opened his Nexo account strictly to utilize the EIP (Dkt. #2 at ¶ 51). He invested more than $2 million into the EIP, earning interest along the way (Dkt. #2 at pp. 21–22). Then, after an investigation revealed that Nexo's EIP was an unregistered security, the SEC required Nexo to cease servicing clients in the United States by April 1, 2023 (Dkt. #2 at ¶¶ 4, 49). Around January or February of 2023, Nexo informed Dr. Fagan that it would cease operations in Texas, which would thereby trigger his obligation to withdraw his account balance by April 1, 2023, or risk losing it altogether (Dkt. #2 at p. 16). His attempts to do so were unsuccessful until finally, in March, he was able to access his account briefly so that he could "unstake"[3] his cryptocurrency to prepare it for withdrawal (Dkt. #2 at p. 18). Then, on March 15, 2023, Dr. Fagan and all other Texas investors received a renewed notice that "US client[s] from Texas" who used the EIP should "begin planning the withdrawal of [their] funds at a convenient time" by April 1, 2023 (Dkt. #2 at p. 20). His repeated attempts to withdraw his account balance by that date failed due to his inability to access his account (*See* Dkt. #2 at pp. 20–21). When he finally regained access, he found that only $2,125.07 out of the more than $2 million he had invested in the EIP remained (Dkt. #2 at ¶ 81). Dr. Fagan claims that the withdrawals and transfers that were made on his account in March of 2023 should have been prohibited by the terms governing fixed term EIPs (Dkt. #2 at ¶ 71). Indeed, he insists that "under fixed terms, an investor cannot withdraw his or her crypto assets and interest until the end of a defined term" (Dkt. #2 at ¶ 71). Yet despite the fact that his fixed term was not

---

[3]  According to Dr. Fagan's Complaint, "unstaking" refers to "the practice of locking digital tokens to a blockchain network in order to earn rewards. While staked, crypto tokens cannot be withdrawn" (Dkt. #2 at p. 18).

scheduled to end until mid-March 2023, he discovered that all of his funds had been depleted by March 5, 2023, in violation of Nexo policies (Dkt. #2 at ¶ 71). Accordingly, he filed suit to recover the funds he had lost under the EIP (*See* Dkt. #2).

In sum, the entirety of this litigation begins and ends with Nexo's EIP. Thus, the terms that should govern forum selection are those that govern the EIP—the Earn Terms (Dkt. #5-3). But the forum selection clause in the Earn Terms mandates that claims be brought in "Nexo jurisdiction," without defining that term (Dkt. #5-3 at p. 8). For a forum selection clause to be enforced as mandatory, it must "clearly demonstrate the parties' intent to make [a forum] exclusive." *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 219 (5th Cir. 2009) (quoting *City of New Orleans v. Mun. Admin. Servs., Inc.*, 376 F.3d 501, 504 (5th Cir. 2004)). The forum selection clause in the Earn Terms do not clearly designate an exclusive forum. Indeed, the clause does not designate any cognizable forum at all. At a minimum, the clause is ambiguous. And because "[a]mbiguous forum selection clauses must be construed against the drafter," the Court will construe the forum selection clause in the Earn Terms against Nexo and decline to enforce it. *Res. Now Grp., Inc. v. O'Shea*, No. 4:17-CV-00726, 2018 WL 453924, at *3 (E.D. Tex. Jan. 17, 2018) (citing *Keaty v. Freeport Indonesia, Inc.*, 503 F.2d 955, 957 (5th Cir. 1974)).

The Court's conclusion finds support in a recent similar action involving Nexo: *Jeong v. Nexo Financial LLC*. No. 21-CV-02392-BLF, 2022 WL 174236 (N.D. Cal. Jan. 19, 2022). There, a district court in the Northern District of California interpreted an identical forum selection clause in a different, but analogous set of Nexo's terms and conditions. *Id*. Specifically, the court evaluated whether to enforce a forum selection clause in Nexo's "Borrow Terms" that identified "Nexo jurisdiction" as the alleged mandatory forum. *Id*. at *27–29. The court declined to do so, stressing

the clause's ambiguity in selecting the appropriate forum. *Id.* at *29. Like here, in that litigation, Nexo pointed to a different agreement, the "Wallet Terms,"[4] which required disputes to be litigated in London, England. *Id.* The court rejected that argument, noting that "[e]ven if the Borrow Terms are read in light of the Wallet Terms, 'Nexo jurisdiction' is still an undefined term" and, thus, "the forum selection clause in the Wallet Terms does not change [the court's] interpretation of the Borrow Terms' forum selection clause." *Id.* The Court agrees. Like it did in *Jeong*, here, Nexo points to a different contract with a different, more concrete forum selection clause in an agreement under which the plaintiff is not pursuing any relief. That makes sense, because "Nexo jurisdiction" does not exist. But the Earn Terms are at the heart of this dispute; the Service Terms are not. The Court's analysis rejects Defendants' fundamental position that two different contracts with conflicting forum selection clauses must be read together simply because the parties entered into both. Accordingly, like the court in *Jeong*, here, the Court concludes that "since the [Earn Terms] provide the more specific provisions governing the Nexo [EIP], they should govern over the more general provisions of the [Service Terms]." *Id.* at *28 (citing *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1063 (9th Cir. 2020)). And because the Earn Terms do not clearly indicate an appropriate forum, the Court need not give effect to its ambiguous forum selection clause.

**B.    Earn Terms Amendments**

Having determined that the Earn Terms govern and lack an enforceable forum selection clause, the Court examines Defendants' alternative argument. That is, Nexo's argument that it amended its Earn Terms on March 9, 2021 to add to the Earn Terms a London forum selection

---

[4]  According to Augustus Greaves, a director at Nexo, the Service Terms were "referred to as the Nexo Wallet Services General Terms and Conditions for those versions issued before December 14, 2022" (Dkt. #5-2 at p. 2 n.1). Accordingly, the court's analysis in *Jeong* regarding the Wallet Terms examined a previous version of the Service Terms that the Court analyzes today.

clause like the one in the Service Terms and, therefore, the Court should give effect to that amendment (Dkt. #5 at p. 12; Dkt. #25 at pp. 6–8). Dr. Fagan counters that Nexo's amendment to the Earn Terms is not enforceable because it was illusory and Dr. Fagan lacked notice of the amendment (Dkt. #28 at pp. 6–8). The Court agrees with Dr. Fagan.

To properly evaluate the parties' arguments on the enforceability of Nexo's alleged amendment to the Earn Terms, a brief timeline may be helpful. Dr. Fagan created an account with Nexo on February 19, 2021 (Dkt. #2 at ¶ 51; Dkt. #5-2 at ¶ 4). To complete the sign-up process, Nexo required Dr. Fagan to click a button verifying that he agreed with Nexo's terms and conditions and privacy policy (Dkt. #25 at p. 6; Dkt. #25-1 at ¶ 8; Dkt. #25-2).[5] When Dr. Fagan created his Nexo account on February 19, 2021, the Earn Terms contained the forum selection clause directing disputes to "Nexo jurisdiction" (Dkt. #5-3 at p. 8). The Earn Terms also contained a provision in which Nexo reserved the right to "change the conditions for entering into the Agreement or use of the Nexo Earn Interest Product" at its "absolute and sole discretion" (Dkt. #5-3 at p. 3). On March 9, 2021, Nexo exercised that right by unilaterally amending its Earn Terms (*See* Dkt. #5-5). The amendment made two key changes. First, Nexo amended its Earn Terms to contain a forum selection clause directing all disputes raised under the Earn Terms to be litigated in London,

---

[5]  One ground that Dr. Fagan raises as a basis for denying Defendants' FNC Motion is that "[t]he Earn Terms and Service Terms are contained within browsewrap agreements, which do not form a valid contract between Nexo and Dr. Fagan" (Dkt. #16 at pp. 7–9). The Court disagrees.

While the enforceability of forum selection clauses turns on federal law, *Braspetro Oil Servs.*, 240 F. App'x at 615 (citing *Scherk*, 417 U.S. at 516), the Court applies state law to decide contract validity. *First Options v. Kaplan*, 514 U.S. 938, 944 (1995). Under Texas law, "clickwrap" agreements—like the one that Dr. Fagan signed—"'are generally defined by the requirement that users assent to contract terms by clicking some sort of I agree or accept button on a website to complete the transaction.'" *Alexander v. Experian Info. Sols., Inc.*, No. 4:24-CV-93, 2025 WL 1840599, at *5 (E.D. Tex. July 3, 2025) (quoting *StubHub, Inc. v. Ball*, 676 S.W.3d 193, 200 (Tex. App.—Houston [14th Dist.] 2023, no pet.)). Clickwrap agreements are enforceable in Texas. *RealPage, Inc. v. EPS, Inc.*, 560 F. Supp. 2d 539, 545 (E.D. Tex. 2007) (collecting cases and stating that "Texas law recognizes the validity of clickwrap agreements"). Accordingly, the Court concludes that the original Earn Terms and Service Terms were valid clickwrap agreements.

England (Dkt. #5-5 at p. 10). Second, Nexo added the following provision regarding future amendments:

> Nexo shall reserve its right to amend or supplement these General Terms from time to time. Any such amendments or supplements shall become valid and in full force as of the date of their publishing on the Nexo Platform unless otherwise indicated, while they shall not affect the current terms of your active Nexo Earn Interest Products for a Fixed Term. You shall regularly check the Nexo Platform to inform yourself about any such amendments or supplements. By continuing to use the Nexo Earn Interest Product, after any such amendments or supplements have taken effect, you thereby indicate your acceptance of the amended or supplemented General Terms. If you do not wish to be bound by any amendments or supplements to these General Terms, you shall discontinue your use of the Nexo Earn Interest Product immediately.

(Dkt. #5-5 at p. 10). Nexo relies on the London forum selection clause in the newly amended Earn Terms in support of its FNC Motion (Dkt. #5 at p. 12). But Dr. Fagan contends that, because neither provision was present in the Earn Terms when Dr. Fagan initially agreed to them, the amendments are unenforceable because he lacked notice of them (Dkt. #16 at pp. 10–11). Dr. Fagan's argument wins the day.

Again, the Court must apply state law when analyzing the validity of a contract and its amendments. *See Kaplan*, 514 U.S. at 944. In Texas, "one party cannot unilaterally modify the terms of the original contract." *Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 403 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Indeed, "[a] modification must satisfy the elements of a contract: a meeting of the minds supported by consideration." *Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 228 (Tex. 1986). But before the Court can evaluate the propriety of the purported modification, the Court must first address a threshold issue: that Nexo's ability to unilaterally modify the Earn Terms to add a forum selection clause is illusory.

1.      **Illusory Agreements**

First and most importantly, Nexo's ability to unilaterally modify the Earn Terms renders the amendment provision illusory. Generally, if one party can unilaterally modify or terminate an agreement without prior notice to the other party, that agreement is based upon an illusory promise and is therefore unenforceable. *Weekley Homes, L.P. v. Rao*, 336 S.W.3d 413, 419 (Tex. App.—Dallas 2011, pet. denied). It is here that the enforceability of Nexo's attempted amendment against Dr. Fagan falls apart. Both versions of the Earn Terms—the one in place on February 19, 2021 and the version amended on March 9, 2021—contain the same fatal flaw. That is, they both allow Nexo to amend the Earn Terms without notifying its customers (Dkt. #5-3 at p. 3; Dkt. #5-5 at p. 10). Instead, Nexo places the onus on its clients to "regularly check the Nexo Platform to inform yourself about any such amendments or supplements" (Dkt. #5-5 at p. 10). That will not do.

The Fifth Circuit looks to caselaw interpreting arbitration clauses to interpret issues related to forum selection clauses pointing to foreign jurisdictions. *See, e.g.*, *Mitsui & Co. (USA), Inc. v. Mira M/V*, 111 F.3d 33, 36–37 (5th Cir. 1997); *see also Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533–34 (1995). In the Fifth Circuit, an arbitration provision is illusory if one party can "'avoid its promise to arbitrate by amending the provision or terminating it altogether.'" *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012) (quoting *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010)). Applied to this context, where one party to an agreement seeks to enforce its rights under the agreement by initiating a lawsuit, and the other party can suddenly change the terms of the agreement to litigate in a forum of their choosing, "then the agreement was illusory from the outset." *See id.* The question, then, is whether Nexo had the power to make changes to its forum selection clause that have retroactive effect. It did.

The Court first interprets the reservation of rights in the Earn Terms when the parties originally contracted—i.e., the version of the Earn Terms that was in place on February 19, 2021— to determine whether the clause had retroactive effect. The provision at issue allowed Nexo, "at any time, at [its] sole and absolute discretion" to "change the conditions for entering into the Agreement or use of the Nexo Earn Interest Product" (Dkt. #5-3 at p. 3). Nexo's reservation of rights to amend at its sole discretion renders that provision illusory. The Fifth Circuit's analysis in *Carey v. 24 Hour Fitness, USA, Inc.* illustrates the Court's conclusion. 669 F.3d at 202. There, the arbitration clause at issue granted 24 Hour Fitness the "right to revise, delete, and add to the [the document]" in which the arbitration provision was located. *Id.* at 206. Critically, however, there was no language in the contract that prevented 24 Hour Fitness from retroactively changing any amendments. *Id.* In other words, "[i]f a 24 Hour Fitness employee sought to invoke arbitration with the company pursuant to the agreement, nothing would prevent 24 Hour Fitness from changing the agreement and making those changes applicable to that pending dispute if it determined that arbitration was no longer in its interest." *Id.* The Fifth Circuit added that it interprets "silence about the possible retroactive application of amendments to the arbitration policy" to allow amendments to apply retroactively, thereby rendering the agreement illusory. *Id.* at 206–07. The same is true of the Earn Terms (*See* Dkt. #5-3). Nexo's reservation of rights under the Earn Terms made no attempt to prevent Nexo from amending the terms to require the parties to litigate in London and applying that amendment retroactively (*See* Dkt. #5-3).

As the Fifth Circuit has recognized, the "fundamental concern" underlying its line of caselaw interpreting arbitration agreements is "the unfairness of a situation where two parties enter into an agreement that ostensibly binds them both, but where one party can escape its obligations

26

under the agreement by modifying it." *Id.* at 209. The Earn Terms directly implicate that concern. They gave Nexo license to amend the Earn Terms whenever it saw fit to mandate any claims brought under the Earn Terms to be litigated in London, thereby "escap[ing] its obligations" to litigate elsewhere (*See* Dkt. #5-3). That unilateral license renders Nexo's ability to amend its Earn Terms illusory.[6]

### 2.    Contract Modification Requirements

Having determined that the amendment provision in the original Earn Terms agreement that Dr. Fagan executed was illusory, the only way to give effect to Nexo's London forum selection clause is if the modification was supported by consideration and mutual assent such that it constituted a new agreement. Once more, a contract modification must independently satisfy the traditional requirements of contract formation—mutual assent and new and independent consideration. *See Hathaway*, 711 S.W.2d at 228. Thus, in order to enforce the London forum selection clause in the Earn Terms, Nexo must establish that the London clause was supported by mutual assent and "fresh" consideration. *See Barnhill v. Moore*, 630 S.W.2d 817, 820 (Tex. App.—Corpus Christi 1982, no writ). Nexo has not carried its burden to establish that either requirement supports the proposed modification.

The threshold issue preventing the enforcement of the forum selection clause in the modified version of the Earn Terms is that the modification constitutes a "browsewrap"

---

[6]  Critically, the Court is not holding that the entire Earn Terms agreement is illusory and, therefore, unenforceable. Rather, the Court is simply holding that the provision permitting Nexo to unilaterally amend the Earn Terms is illusory and, therefore, any subsequent amendment must be supported by new and additional consideration and renewed mutual assent. Generally, Texas contract law permits courts to sever unenforceable provisions from a contract and enforce the remaining provisions of the contract "so long as it does not constitute the essential purpose of the agreement." *In re Poly-Am., L.P.*, 262 S.W.3d 337, 360 (Tex. 2008). Here, there is no doubt that Nexo's ability to amend the Earn Terms does not constitute the essential purpose of the agreement. Accordingly, at this stage, the Court will sever only the illusory portion of the agreement—the amendment provision.

agreement. *StubHub*, 676 S.W.3d at 200. A browsewrap agreement "typically involve[s] a situation where a notice on a website conditions use of the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via a hyperlink." *Id.* at 200–01. Unlike clickwrap agreements, browsewrap agreements "do[ ] not require the user to manifest assent to the terms and conditions [of a website] expressly . . . ." *Id.* Instead of clicking an "I accept" or "I agree" button, the user assents to a browsewrap agreement "simply by using the website." *Id.* Texas law leaves the enforceability of browsewrap more open. That is, the enforceability of browsewrap agreements turns on whether the user had "'actual or constructive knowledge of a site's terms and conditions prior to using the site.'" *Id.* (quoting *Phillips v. Neutron Holdings, Inc.*, No. 3:18-CV-3382-S, 2019 WL 4861435, at *4 (N.D. Tex. Oct. 2, 2019)).

While the initial Earn Terms that Dr. Fagan initially agreed to upon the creation of his Nexo account constituted a valid clickwrap agreement (notwithstanding the unenforceability of the illusory amendment provision), the modified version of the Earn Terms that took effect on March 9, 2021 is browsewrap. *See id.* Indeed, even the modified portion of the agreement addressing future amendments provides that any amendments "shall become valid and in full force as of the date of their publishing on the Nexo Platform" and requires Nexo clients to "regularly check the Nexo Platform to inform [themselves] about any such amendments or supplements" but did not require an affirmative action to accept the terms (Dkt. #5-5 at p. 10). Rather, the Earn Terms allow the mere continued use of the platform to serve as a proper method of accepting the modified terms (Dkt. #5-5 at p. 10) ("By continuing to use the Nexo Earn Interest Product, . . . you thereby indicate your acceptance of the amended or supplemented General Terms."). The question, then, becomes

whether Dr. Fagan had actual or constructive notice of the amended materials in the March 9 version of the Earn Terms. He did not.

The Court is not convinced that Nexo has demonstrated that Dr. Fagan had actual or constructive notice of the modified Earn Terms (*See* Dkt. #5; Dkt. #25). As Dr. Fagan explains, "Nexo's terms and conditions are buried at the bottom of its website amongst thirty-five similar links" (Dkt. #16 at p. 9). Thus, they are located as far from the "login" and "sign-up" links as possible (Dkt. #16 at p. 9). As to actual notice, Nexo does not even purport to argue that it notified Dr. Fagan of the amended Earn Terms or the addition of the London forum selection clause (*See* Dkt. #5; Dkt. #25). Instead, it argues that Dr. Fagan had constructive knowledge based simply upon his use of the Fixed Term EIP, which is described in detail in the March 9 amendment to the Earn Terms (Dkt. #25 at pp. 7–8). That is not enough. As the party seeking to enforce the amendment, Nexo bears the burden to prove that Dr. Fagan was constructively aware of the amended Earn Terms. *Phillips*, 2019 WL 4861435, at *4. Nexo's bare assertion that Dr. Fagan continued to utilize the Nexo platform and elected to use a Fixed Term that was detailed in the March 9 amendment and, therefore, agreed to that amendment, is insufficient to carry that burden.

But even assuming *arguendo* that Dr. Fagan had actual or constructive knowledge of the amended Earn Terms, Nexo's argument still misses the mark because the amendment was unsupported by new and additional consideration. The consideration required to enforce a contract modification is consideration over and above that for which the parties previously bargained. *See, e.g.*, *Fossil Fuels, Inc. v. Hyde-Bower, Inc.*, No. 05-92-01461-CV, 1993 WL 189817 (Tex. App.—Dallas June 3, 1993, no writ) (quoting *Barnhill*, 630 S.W.2d at 820) ("New or 'fresh' consideration is required for the modification of an existing agreement."). That "fresh" consideration is lacking

here. Nexo, of course, disagrees. In its view, the more than $250,000 in interest that Dr. Fagan has

accrued under the Nexo EIP constitutes consideration sufficient to support the modification (Dkt.

#5 at p. 12; Dkt. #25 at p. 7). Indeed, Nexo argues that "[i]n exchange for agreeing to the Earn

Terms, including its mandatory forum selection clause . . . , Fagan received substantial benefits,

including interest rates that earned him over a quarter million dollars . . . ." (Dkt. #5 at p. 12). The

Court disagrees.

The $250,000 in accrued interest that Dr. Fagan accepted since joining Nexo represents

past consideration. And a universal tenet of contract law is that past consideration is no

consideration at all. *See, e.g.*, *Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 659 (Tex.

2006) ("[P]ast consideration is not consideration.") (internal citations omitted). Nexo's promise

to distribute interest payments on digital assets through its EIP offering was nothing more than a

continued obligation under the Earn Terms agreement that the parties had already executed (Dkt.

#5-3 at pp. 3–4) (describing the accrual of interest available to earn under the EIP). Nexo does not

direct the Court to any "fresh" consideration that could support Nexo's unilateral modification of

the Earn Terms beyond the consideration that supported the initial Earn Terms. *See Barnhill*, 630

S.W.2d at 820. In other words, Dr. Fagan did not "bargain for" the addition of the London clause.

*See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (defining consideration as

"a *present* exchange bargained for in return for a promise") (emphasis added). Accordingly, the

modified Earn Terms—specifically, the London forum selection clause within the Earn Terms—

are unenforceable because the modification is unsupported by new consideration. *See, e.g.*, *Richie v.

JP Morgan Chase Bank*, No. 3:11-cv-1500-N, 2012 WL 12884859, at *3–4 (N.D. Tex. Dec. 13, 2012)

(holding that a modification to an existing agreement was invalid because the plaintiff provided no

new consideration beyond what the plaintiff was "already contractually obligated to pay according to the terms of the original loan"); *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 93 (5th Cir. 1995) (observing that consideration from an original contract cannot constitute consideration for a subsequent modification).

In sum, the Court concludes that the Earn Terms govern this dispute because this action is predicated upon the recovery of funds that Dr. Fagan earned under the EIP. When Dr. Fagan opened his Nexo account on February 19, 2021, he agreed to the Earn Terms, which lacked a forum selection clause pointing to any coherent foreign or domestic jurisdiction. The Earn Terms governing Dr. Fagan and Nexo's relationship did, however, allow Nexo to unilaterally modify the Earn Terms "at any time" and "at [its] sole discretion" (Dkt. #5-3 at p. 3). That provision was illusory because it empowered Nexo to escape its obligations under the agreement by requiring Dr. Fagan to litigate his claim in an unknown forum to be decided at a later date and at Nexo's exclusive discretion. Thus, for the Court to enforce the London clause, Nexo had the burden to demonstrate that new and independent consideration and mutual assent supported the modification such that it qualified as a new contract. Nexo did not carry that burden, as the March 9 version of the Earn Terms constituted inconspicuous "browsewrap" about which Dr. Fagan did not have actual or constructive knowledge. Finally, Nexo did not demonstrate that any consideration beyond the $250,000 in accrued interest—which it had already agreed to pay as part of the initial Earn Terms—could support the modification. Consequently, Defendants' FNC Motion (Dkt. #5) should be **DENIED**.

### III.    28 U.S.C. § 1404

Having determined that dismissal pursuant to *forum non conveniens* is not warranted, the Court turns to Defendants' alternative argument—that the case should be transferred to the

Northern District of Texas, Fort Worth Division. As the party moving to transfer venue, Defendants have the burden of proving that transferring the cause to the Northern District would be "clearly more convenient." *Volkswagen II*, 545 F.3d at 315. It would not; the case stays here.

The threshold inquiry on a § 1404(a) motion to transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *Volkswagen I*, 371 F.3d at 203. Under 28 U.S.C. § 1391(b)(2), venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ." There is no dispute that this action could have been filed originally in the destination venue—the Northern District of Texas, Fort Worth Division (Dkt. #5 at p. 20; Dkt. #16 at p. 14). Thus, the threshold inquiry is satisfied and the Court next considers the private and public interest factors.

## A.    Private Interest Factors

The Court begins by analyzing the private interest factors. Those are:

> (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive.

*Volkswagen II*, 545 F.3d at 315 (citations omitted). The Court addresses each in turn.

### 1.    The Relative Ease of Access to Sources of Proof

The first factor is neutral. Courts analyze this factor in light of the distance that documents or other evidence must be transported from their existing location to the trial venue. *Id.* at 316. Despite its continued relevance, the ease of access "has become less significant in a transfer analysis because of the advances in copying technology and information storage." *Faulhaber v. Equifax Info. Serv., LLC*, No. 4:21-CV-140, 2021 WL 5140791, at *4 (E.D. Tex. Nov. 4, 2021). The Fifth Circuit has also held that when "the vast majority of the evidence [is] electronic, and

therefore equally accessible in either forum[,]' this factor bears less strongly on the transfer analysis." *In re Planned Parenthood Fed'n of Am., Inc.*, 52 F.4th 625, 630 (5th Cir. 2022).

Here, Nexo is a Cayman Islands corporation with "substantial operations" in Europe (Dkt. #5 at p. 19). Trenchev is a resident and domiciliary of the United Arab Emirates (Dkt. #5-1). Accordingly, whether this case proceeds to trial in this Court or in the Northern District, Defendants will have to travel internationally to a Texas trial venue. In an effort to tip the scales in favor of transfer, Defendants insist that "Fagan resides in the Northern District and would maintain all records relevant to this action"—as well as his "computer, smart phone, and computer equipment"—in that district (Dkt. #5 at p. 22). But Defendants concede that any relevant records that Nexo maintains are located outside of the United States and, therefore, are equally unavailable in either district (Dkt. #5 at p. 22). Defendants have not demonstrated that transporting the evidence to Fort Worth would be any more convenient—much less *substantially* more convenient—than transporting it to Sherman. This is particularly true given the nature of the evidence. Because most of the evidence in this case would be electronically stored due to the online nature of Dr. Fagan's alleged harm, it would not present a "major undertaking" for Dr. Fagan to transport any evidence to the Eastern District. *See Faulhaber*, 2021 WL 5140791, at *4. Accordingly, the Court concludes that the pertinent evidence in this case would be "equally accessible in either forum" and, thus, this factor weighs neutral. *In re Planned Parenthood*, 52 F.4th at 630.

### 2. Availability of Compulsory Process to Secure Attendance of Witnesses

The second private interest factor—the availability of compulsory process to secure the attendance of witnesses—is also neutral. Neither party identifies a single witness who would be subject to compulsory process in the Northern District but not in this Court, or vice versa (*See* Dkt. #5 at p. 23; Dkt. #16 at p. 16). Defendants' only opposition is their blanket assertion that "[m]ost if

not all domestic witnesses to this matter likely reside in Comanche County, Texas, which is over 200 miles away from Sherman" and, thus, "definitely outside the 100-mile subpoena range of the Eastern District" (Dkt. #5 at p. 23). Defendants' argument is unavailing.

Federal Rule of Civil Procedure 45 provides that the court may compel a person to attend a trial, deposition, or hearing:

> (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; *or*
>
> (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
>
> > (i) is a party or a party's officer; or
> >
> > (ii) is commanded to attend a trial and would not incur substantial expense.

FED. R. CIV. P. 45 (emphasis added).

In other words, a federal district court's subpoena power is not necessarily limited to the 100-mile radius from the court's brick-and-mortar location. Federal district courts can command nonparty witnesses located more than 100 miles from the courthouse to comply with a subpoena provided the witness resides, is employed, or regularly transacts business within the state *and* would not incur substantial expense by complying. *Potter v. Cardinal Health 200, LLC.*, No. 2:19-cv-00007, 2019 WL 2150923, at *3 (E.D. Tex. May 16, 2019) ("[A] district court has subpoena power over residents of the state in which the district court sits . . . non-party residents can be . . . compelled as long as their attendance would not result in 'substantial expense.") (quoting FED. R. CIV. P. 45(c)(1)(B)(i)–(ii)); *Texas Data Co. v. Target Brands, Inc.*, 771 F. Supp. 2d 630, 641–42 (E.D. Tex. 2011) (distinguishing *absolute* subpoena power, which the court enjoys over witnesses located fewer than 100 miles from the courthouse, from the court's general subpoena power, which it enjoys over witnesses within the state) (citing *Volkswagen II*, 545 F.3d at 316); *see*

*also Williams v. City of Cleveland*, 848 F. Supp. 2d 646, 656 (N.D. Miss. 2012) ("Aberdeen is certainly over 100 miles from Cleveland, which meets the distance requirement in [Rule 45(c)], but, since both cities are located in Mississippi, this Court has the authority to order residents to attend trial in Aberdeen. This authority is subject to [Rule 45(d)].").

Thus, Defendants are incorrect to suggest that the Court would lack the power to command a nonparty witness from Comanche County, Texas to attend trial in Sherman. As Dr. Fagan confirms, De Leon, Texas is located approximately 200 miles from the Sherman courthouse and 120 miles from the Fort Worth courthouse (Dkt. #16 at p. 16). The Court's power to compel a (still unidentified) witness residing in De Leon, Texas to attend trial in Sherman would be limited to the same extent as the Northern District's power to compel that same witness to attend trial in Forth Worth. In either situation, the only limitation on the courts is whether the witness would incur substantial expense by complying.[7] The only remaining question, then, is whether travelling 200 miles as opposed to 120 miles would cause the witnesses traveling that distance to incur substantial expenses. The additional 80 miles necessary to travel to Sherman is negligible and would not require the De Leon witnesses (whoever they may be) to incur substantial expense.

Moreover, courts give greater weight to specifically identified witnesses and less weight to broad, unsupported assertions. *Faulhaber*, 2021 WL 5140791, at *4. Defendants bear the burden to

---

[7] This limitation is enforced by Rule 45(d), in which a subpoena must be quashed if it causes the witness to incur substantial expense in traveling more than 100 miles. But that mandate is qualified by the committee notes to the 2013 Amendment to Rule 45: "When travel over 100 miles could impose substantial expense on the witness, the party that served the subpoena may pay that expense and the court can condition enforcement of the subpoena on such payment." FED. R. CIV. P. 45(c)–(d) advisory committee's note to 2013 amendment. For the reasons stated in this Section, the Court is not persuaded that requiring the hypothetical witnesses about which Defendants are concerned to travel 200 miles from De Leon to Sherman would even begin to impose an impermissible burden on those potential witnesses. But even to the extent that it did, the Court could *still* enforce that subpoena by requiring Dr. Fagan to pay those expenses.

demonstrate and identify third-party witnesses that would be unwilling to travel to Sherman and would benefit from the transfer. *VanHauen v. Am. Home Mortg. Servicing, Inc.*, No. 4:11-CV-461, 2011 WL 6955708, at *3 (E.D. Tex. Dec. 15, 2011). But in their Motion and Reply, Defendants do not identify a single third-party witness that resides within 100 miles of either the Eastern or Northern Districts (*See* Dkt. #5 at p. 24; Dkt. # 25 at p. 11). The Court finds this factor neutral.

### 3. Cost of Attendance for Witnesses

The third private interest factor is similarly neutral. The Fifth Circuit applies the "100-mile" rule to determine the burden that a venue places on witnesses who participate in the case. If "the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Volkswagen I*, 371 F.3d at 204. The distance between the federal courthouse in Sherman and the federal courthouse in Fort Worth is 91 miles.[8] Thus, the Court need not evaluate witness inconvenience based on additional distance travelled.

But even if it did, Defendants have not identified any specific nonparty witness who would have to travel to testify (Dkt. #5 at p. 23). Neither has Dr. Fagan (*See* Dkt. #16). Thus, "the number and location of willing witnesses is largely speculative at this point." *Uniloc USA, Inc. v. Activision Blizzard, Inc.*, No. 6:13-cv-526, 2014 WL 11609813, at *4 (E. D Tex. July 16, 2014). The Court would ordinarily proceed to evaluating who the most relevant witnesses are and where they reside, but at this juncture, it cannot. *See E-Sys. Design, Inc. v. Mentor Graphics Corp.*, No. 4:17-CV-00682, 2018 WL 2463795, at *3 (E.D. Tex. June 1, 2018). Because Dr. Fagan, a party witness, is the only

---

[8]  This distance was determined by using Apple Maps. The Court uses 101 E. Pecan St., Sherman, TX 75090 for the Sherman courthouse and 501 W. 10th St., Fort Worth, TX 76102 for the Fort Worth courthouse.

domestic witness identified thus far, and because courts give less weight to the plaintiff's alleged inconvenience in litigating the case here, *Faulhaber*, 2021 WL 5140791, at *4, this factor is neutral.

### 4.    All Other Practical Problems

Defendants dedicate one sentence to this factor, stating that "there are no practical problems that would prevent the case from being 'easy, expeditious, and inexpensive' to try in the Northern District, while the factors . . . indicate that trial in the Eastern District would be inconvenient and difficult for all involved" (Dkt. #5 at p. 23). That does nothing to advance their argument. Therefore, this factor is neutral.

### B.    Public Interest Factors

Having determined that the private interest factors, individually and collectively, are neutral, the Court turns to the public interest factors. The § 1404 public interest factors are:

> (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law.

*Volkswagen II*, 545 F.3d at 315 (citations omitted). There is no dispute as to factors (1), (3), and (4)—Defendants concede that those factors are the same in each district and are, therefore, neutral (Dkt. #5 at p. 24). The Court agrees.

The only remaining dispute in the Court's transfer analysis is the second public interest factor—the local interest in having localized disputes decided at home. When assessing the local interest factor, the key question is whether there exists a "relevant factual connection" to the Eastern District of Texas. *See Volkswagen II*, 545 F.3d at 317–18. Defendants claim that there is not (Dkt. #5 at p. 24). Indeed, the events giving rise to this action occurred online, and their effects were felt in Comanche County, Texas. Dr. Fagan is a resident of De Leon, Texas. Thus, the

Northern District of Texas, Fort Worth division, which embraces Comanche County, has a significant local interest in resolving this dispute.

But as Dr. Fagan observes, this is not the type of case that "call[s] into question the reputation of individuals that work and conduct business in the community." *Francis v. Api Tech. Servs., LLC*, No. 4:13-CV-627, 2014 WL 11462447, at *10 (E.D. Tex. Apr. 29, 2014), *report and recommendation adopted*, No. 4:13-CV-627, 2014 WL 11462449 (E.D. Tex. Sept. 11, 2014). This case involves exclusively foreign defendants. And Nexo's alleged wrongful conduct did not occur solely in the Northern District. Rather, it performed regulatory misconduct by offering an unregistered security to 5,700 Texans—ostensibly, covering every judicial district in the state—and many more clients throughout the country. Thus, while the Northern District has a local interest in deciding localized disputes at home, so too does the Eastern District have an interest in resolving this dispute here. But on balance, the Northern District's local interest in resolving this case outweighs this Court's interest, and thus the second factor counsels in favor of transfer. However, because the foregoing factors remain neutral, the Court is not persuaded that this factor should be given dispositive weight relative to the other factors.

### C.    Conclusion

The Court finds that all but one of the private and public interest factors are neutral. Therefore, the Court finds that Defendants have not satisfied their high burden to show that the Northern District is a "clearly more convenient" forum for this litigation. *See Volkswagen II*, 545 F.3d at 315. The Court will not transfer this case.

## IV.    Federal Rule of Civil Procedure 12(b)(6)

Having untangled the procedural web that Defendants weaved in their Motions to Dismiss, the Court finally arrives at the merits. As their final alternative ground for dismissal, Defendants

challenge the adequacy of Dr. Fagan's Complaint. Accordingly, they move for dismissal under Rule 12(b)(6) on six grounds. First, they claim that his Texas Theft Liability Act ("TTLA") and conversion claims are not adequately pled and are barred by the economic loss rule (Dkt. #6 at pp. 19–23). Second, they maintain that Dr. Fagan's securities claims are barred because allegations of theft do not state a securities fraud claim (Dkt. #6 at pp. 23–27). Third, they assert that he did not adequately plead his securities and common law fraud claims under Rule 9(b) (Dkt. #6 at pp. 25, 27–28). Fourth, Defendants allege that Dr. Fagan's Electronic Funds Transfer Act claims are statutorily barred (Dkt. #6 at pp. 28–31). Fifth, they argue that Dr. Fagan's negligence claim is barred by the parties' contract and the economic loss rule (Dkt. #6 at p. 23). Sixth and finally, Defendants aver that Dr. Fagan's equitable claims are barred because a "contract governs the parties' relationship, Fagan has an adequate remedy at law," and unjust enrichment and constructive trust are not stand-alone causes of action (Dkt. #6 at pp. 31–32). The Court addresses each in turn.

## A.    Dr. Fagan's TTLA and Conversion Claims

Defendants' first Rule 12(b)(6) argument points to Dr. Fagan's TTLA and conversion claims (Dkt. #6 at pp. 19–23). Defendants seek to dismiss those claims on four grounds. Their first two grounds—that Dr. Fagan did not sufficiently plead unlawful appropriation or intent to appropriate to support his TTLA and conversion claims—are meritless (Dkt. #6 at p. 20). After reviewing the relevant pleadings and the arguments contained in the briefing, the Court is satisfied that Dr. Fagan has plausibly averred that Nexo unlawfully appropriated his funds and intended to do so (*See* Dkt. #2). After all, intent may be "'averred generally' as long as the pleadings allege 'sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind.'" *Versata Software, Inc. v. Internet Brands, Inc.*, No. 2:08-CV-313-WCB,

2012 WL 226640, at *3 (E.D. Tex. Jan. 17, 2012). Thus, the Court moves on to Defendants' third and fourth grounds for dismissal.

Defendants' next ground for dismissal is under the "economic loss rule" (Dkt. #6 at pp. 20–22). The economic loss rule applies to "bar claims for negligence and other tort claims when the parties' relationship and its attendant duties arise from a contract." *Tavernini v. Bank of Am., N.A.*, No. 4:12CV420, 2014 WL 1290063, at *14 (E.D. Tex. Mar. 31, 2014) (citing *Southwestern Bell Tel. Co. v. Delanney*, 809 S.W.2d 493, 494–95 (Tex. 1991)). Defendants contend that "Nexo's obligations with respect to the EIP and the cryptocurrency Fagan deposited on the Nexo platform, including any obligations to prevent unauthorized transfers of those assets, are governed by the Earn and Services Terms" and, thus, Dr. Fagan's exclusive remedy arises under those agreements (Dkt. #6 at p. 21). The Court disagrees.

In Texas, the test to determine the applicability of the economic loss rule is whether the defendant's conduct "would give rise to liability independent of the fact that a contract exists between the parties . . . ." *Id.* at 494. On the other hand, "if the defendant's conduct . . . would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract." *Id.* Based upon the factual allegations in Dr. Fagan's Complaint, the Court is convinced that Nexo's alleged wrongful conduct would give rise to liability independent of the existence of any agreement between Nexo and Dr. Fagan. *See id.* After all, "Texas courts have specifically recognized that because the law of conversion and bailment imposes legal duties outside any contractual agreements, separate causes of action for breach of contract and conversion may arise from the same facts." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Care Flight Air Ambulance Serv., Inc.*, 18 F.3d 323, 326 (5th Cir. 1994); *see also Vickery v. Tex. Carpet Co., Inc.*, 792 S.W.2d 759,

762–63 (Tex. App.—Houston [14th Dist.] 1990, writ denied) (allowing a breach of contract and conversion claim to arise when the defendants failed to pay an invoice for goods delivered and kept the goods). Consequently, Defendants' third basis for dismissing Dr. Fagan's Complaint also fails.

That brings the Court to Defendants' final basis for dismissing Dr. Fagan's TTLA and conversion claims—that the EIP is fungible and not specifically identifiable. In Texas, money can be the subject of conversion only where it can be identified as a specific chattel. *Entm't Merch. Tech., L.L.C. v. Houchin*, 720 F. Supp. 2d 792, 799 (N.D. Tex. 2010). That is, when the money is: "(1) delivered for safe keeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by the keeper." *In re TXNB Internal Case*, 483 F.3d 292, 308 (5th Cir. 2007). Defendants claim that, without an identifiable *res*, Dr. Fagan's TTLA and conversion claims cannot lie. The Court disagrees. At this stage, Dr. Fagan has met his pleading burden on his TTLA and conversion claims. Dr. Fagan's Complaint specifically identifies the cryptocurrency types and amounts that were allegedly converted from his Nexo account (Dkt. #2 at ¶ 69). Thus, dismissal at this stage would be premature given the nature and sufficiency of the allegations in Dr. Fagan's Complaint.

### B.    Dr. Fagan's Negligence Claim

The Court moves forward to the adequacy of Dr. Fagan's negligence claim. Defendants mount a three-pronged attack on Dr. Fagan's negligence claim. First, they contend that the economic loss rule bars his claim (Dkt. #6 at p. 23). Second, they claim that Nexo did not owe Dr. Fagan a duty of care recognized by common law (Dkt. #6 at p. 23). Third, they allege that Dr. Fagan's allegations of intentional theft preclude a negligence claim (Dkt. #6 at p. 23). None of Defendants' arguments are persuasive.

As to Defendants' first challenge, the Court already determined that Dr. Fagan's Complaint sufficiently alleges Nexo's extra-contractual liability which could give rise to a tort claim. *See supra* Section IV.A. That argument fails. Defendants' duty of care challenge fares no better. In their view, Nexo's duty arose under the Earn Terms and Service Terms, but it did not take on a duty recognized by common law. The Court is persuaded by Dr. Fagan's citations to analogous authority (Dkt. #17 at p. 17) (citing *First State Bank of Lyford v. Parker*, 27 S.W.2d 279, 281 (Tex. App.—San Antonio 1930, writ dism'd w.o.j.) ("A bank is liable for money deposited with it, regardless of how it may be lost.") (internal citations omitted); *Gilstrap v. Beakley*, 636 S.W.2d 736, 741 (Tex. App.— Corpus Christi–Edinburg 1982, no writ) ("A creditor in possession of property securing a debt owes a duty of ordinary care to secure and preserve the property."). The Court concludes that Dr. Fagan has pleaded sufficient facts to give rise to a duty for Nexo to exercise reasonable care to safeguard his funds. Third and finally, the Court examines Defendants' argument that Dr. Fagan's allegations of intentional unlawful conduct by Nexo undermines his negligence claim. It does not. Dr. Fagan is permitted to plead in the alternative, and it is clear to the Court that he did so here. *See, e.g.*, *True Believers Ink 2, Corp. v. Russell Brands, LLC.*, No. 4:18-CV-00432, 2019 WL 4039888, at *3 (E.D. Tex. Aug. 27, 2019) (explaining that it is unnecessary for a plaintiff to "clearly indicate" that that he is pleading in the alternative); FED. R. CIV. P. 8(d). His negligence claim survives.

### C.    Dr. Fagan's Securities Claims

Defendants advance four arguments in support of their motion to dismiss Dr. Fagan's securities claims. First, they contend that allegations of theft of securities "cannot substantiate a securities fraud claim" (Dkt. #6 at p. 24). Second, they claim that Dr. Fagan's securities claims are not pleaded with particularity in satisfaction of Rule 9(b) (Dkt. #6 at p. 25). Third, they argue that Dr. Fagan did not adequately plead any recoverable loss tied to Nexo's alleged fraud (Dkt. #6 at p.

26). Fourth, they assert that Dr. Fagan's purchase of the EIP was not a domestic transaction under the Exchange Act or Texas Securities Act (Dkt. #6 at p. 26). The Court is unpersuaded.

The Court begins with Dr. Fagan's allegations of theft. Defendants contend that dismissal is warranted because bare allegations of theft cannot give rise to an actionable securities claim (Dkt. #6 at p. 24). Indeed, Defendants correctly observe that "[a] claim founded *solely* on conversion or theft of securities is not recognizable under § 10(b) and Rule 10b-5." *Advanced Laser Prods., Inc. v. Signature Stock Transfer, Inc.*, No. CIVA.3:98-CV-1624-D, 1999 WL 222385, at *3 (N.D. Tex. Apr. 12, 1999) (emphasis added). But the face of Dr. Fagan's Complaint does not *solely* allege conversion or theft of securities (*See* Dkt. #2). In fact, Dr. Fagan alleges specific representations related to the ability to immediately withdraw EIP funds, account access, and security, all of which induced him into investing in Nexo's EIP (Dkt. #2 at ¶¶ 51, 103–06, 111–14).

The Court is also satisfied that Dr. Fagan pleaded his securities claims with the requisite specificity under Rule 9(b). Rule 9(b)'s particularity requirement generally means that the pleader must set forth the "who, what, when, where, and how" of the fraud alleged. *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005). After reviewing Dr. Fagan's Complaint, the Court is satisfied that he has adequately pleaded the "who, what, when, where, and how" of his securities claims (Dkt. #2 at ¶¶ 51, 103–06, 111–14). *Id.*

Next, the Court turns to Defendants' argument that Dr. Fagan did not adequately plead a recoverable loss attributable to Nexo's fraud (Dkt. #6 at p. 26). Defendants' argument goes like this: because Dr. Fagan does not contest his receipt of interest on the EIP and because the EIP did not "decline[] in value," he has not adequately pleaded any loss attributable to Nexo's alleged wrongful conduct (Dkt. #6 at p. 26). That argument mysteriously overlooks the basis of this entire

lawsuit—that nearly $2 million vanished from Dr. Fagan's account while he was prevented from accessing it. Defendants draw inspiration from *Cress v. Nexo Financial LLC*, a California district court case also involving Nexo in which the court dismissed the plaintiff's claim because "the value of [his] Earn Account was actually higher at the time of liquidation and Cress benefitted financially from interest while he possessed it." No. 23-CV-00882-TSH, 2023 WL 6609352 (N.D. Cal. Oct. 10, 2023). Defendants claim that "[t]he same is true here" (Dkt. #6 at p. 26). Defendants are wrong. Not only did the value of Dr. Fagan's Earn Account not increase, it was reduced to nearly nothing. He has sufficiently alleged loss attributable to Nexo's purported fraud.

Finally, the Court evaluates Defendants' argument that Dr. Fagan's securities claims are not actionable because the EIP is not a domestic security (Dkt. # 6 at p. 26). "[I]t is . . . only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) [of the Exchange Act] applies." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010). Defendants argue that the EIP is a purely foreign security and, therefore, § 10(b) does not apply (Dkt. #6 at p. 26). Defendants cite *Morrison* but do not seem to internalize its application. The test announced in *Morrison* for securities not registered on domestic exchanges is "whether the purchase or sale is made in the United States." *Id.* at 269–70. While the Fifth Circuit has not yet established a particular extraterritoriality test, *U.S. Sec. & Exch. Comm'n v. Balina*, No. 1:22-CV-950-DAE, 2024 WL 4607048, at *3 (W.D. Tex. Aug. 16, 2024), the Court finds the Second and Tenth Circuit tests persuasive. *Williams v. Binance*, 96 F.4th 129, 140–41 (2d Cir. 2024), *cert. denied sub nom. Binance v. Anderson*, 145 S. Ct. 1048 (2025) (holding that a transaction was domestic due to the buyer entering Terms of Use, placing trade orders, and sending payments within the United States); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60,

68 (2d Cir. 2012) ("[I]n order to adequately allege the existence of a domestic transaction, it is sufficient for a plaintiff to allege facts . . . that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security."); *U.S. Sec. & Exch. Comm'n v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1295 (D. Utah 2017*), aff'd sub nom. U.S. Sec. & Exch. Comm'n v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) ("Either a domestic purchaser or a domestic seller of a security may bring a transaction within the purview of Section 10(b)."). Here, Dr. Fagan's online transactions with Nexo—including, *inter alia*, signing up for the Nexo platform, purchasing the EIP, and making deposits and withdrawals—occurred domestically in Texas (*See* Dkt. #2). Accordingly, the Court is satisfied at this stage that Dr. Fagan has plausibly alleged that his purchase of the EIP was a "domestic transaction" within the meaning of § 10(b) and *Morrison*'s transactional test.

### D.    Dr. Fagan's Common Law Fraud Claim

Defendants move to dismiss Dr. Fagan's common law fraud claim for the same reason that they move to dismiss his securities fraud claims—that Dr. Fagan did meet Rule 9(b)'s heightened pleading standard (Dkt. #6 at p. 27). Defendants' new argument fails for the same reason their old one did. The Court is satisfied that Dr. Fagan's complaint adequately identifies the "who, what, when, where, and how" of the fraud alleged. *United States ex rel. Williams*, 417 F.3d at 453. His common law fraud claim survives.

### E.    Dr. Fagan's EFTA Claim

Next, the Court turns to Dr. Fagan's EFTA claim. The EFTA was enacted "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693. The EFTA defines an "unauthorized electronic fund transfer" as "an electronic fund transfer from a consumer's account initiated by a

person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit . . . ." *Id.* § 1693a(12). Dr. Fagan alleges violations of two EFTA provisions: § 1693d and § 1693f (*See* Dkt. #2 at p. 32). Section 1693d requires financial institutions to provide their customers with periodic statements of electronic transfers to and from their accounts. *See Dorsey v. U.S. Bank Nat'l Ass'n*, No. 11-CV-231-JJB, 2012 WL 13001917, at *2 (M.D. La. Apr. 2, 2012). Section 1693f requires consumers to notify the financial institution of any alleged error or unauthorized electronic fund transfer within sixty days of the statement's transmission. *Id.* When a consumer complies with the sixty-day notice requirement, the financial institution is required to investigate the claim and provide the customer with the results of the investigation within ten days of the customer's notification. *Id.*; 15 U.S.C. § 1693f. Dr. Fagan asserts that Defendants violated both provisions.

Defendants move to dismiss Dr. Fagan's EFTA claims on three grounds (Dkt. #6 at pp. 28–31). First, they assert that his EFTA claim is barred by limitations (Dkt. #6 at pp. 28–29). Second, they insist that Nexo's alleged theft of Dr. Fagan's funds does not fall within the scope of the EFTA (Dkt. #6 at p. 29). Third, they contend that Dr. Fagan's account is not governed by the EFTA (Dkt. #6 at pp. 29–31). The Court addresses each in turn.

The Court begins with limitations. Defendants urge the Court to dismiss Dr. Fagan's EFTA claim as time-barred under EFTA's one-year limitations period (Dkt. #6 at pp. 28–29). The EFTA requires a plaintiff to file his EFTA claim "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m(g). Defendants interpret the limitations period to run from the date of the alleged unauthorized transfers about which Dr. Fagan complains (Dkt. #6 at p. 29). According to them, the clock on Dr. Fagan's EFTA claim started some time between February 28

and March 5, 2023, and stopped on March 5, 2024, at the latest (Dkt. #6 at p. 29). Consequently, they argue, because Dr. Fagan did not file his Complaint until May 22, 2024, it is barred (Dkt. #6 at p. 29; Dkt. #1). The Court not persuaded.

Dr. Fagan's EFTA claim asserts violations of § 1693d and § 1693f—the "failure to investigate" provisions of the EFTA (Dkt. #2 at p. 32) (asserting that Nexo violated § 1693d by failing to provide documentation of electronic transfers and that it violated § 1693f by failing to investigate and correct any errors associated with them). Accordingly, he argues that his EFTA claim is governed, not by § 1693m's one-year limitations period, but by some other period tied to Nexo's investigation (or lack thereof) (Dkt. #17 at pp. 28–29). The Court agrees. This is not a case involving "purely unauthorized transfers" such that the traditional one-year limitations period should apply. *See Soileau v. Midsouth Bancorp Inc.*, No. 6:19-CV-00537, 2020 WL 1304744, at *3 (W.D. La. Feb. 26, 2020), *report and recommendation adopted*, No. 6:19-CV-00537, 2020 WL 1303935 (W.D. La. Mar. 17, 2020) ("[I]n the case of *purely unauthorized transfers*, . . . the one-year time limitation is triggered by each individual transfer.") (emphasis added). This is a failure to investigate claim. Accordingly, the limitations clock should be tied to Nexo's alleged failure to investigate. Indeed, "[w]ith respect to a failure to investigate claim, 'in light of the ten-day statutory period within which a financial institution must provide a response, the statute of limitations begins to run ten days after the consumer provides the oral or written notice of the alleged error to the financial institution.'" *Spivak v. JP Morgan Chase Bank, N.A.*, No. 22-CV-04549 (LDH) (RML), 2024 WL 4350718, at *2 (E.D.N.Y. Sept. 30, 2024) (quoting *Apostolidis v. JP Morgan Chase & Co.*, No. 11-CV-5664 (JFB) (WDW), 2012 WL 5378305, at *6 (E.D.N.Y. Nov. 2, 2012)).

Here, Dr. Fagan did not even learn that his account balance had been withdrawn until some time in May of 2023 (Dkt. #2 at ¶¶ 5, 76). And while there is some authority suggesting that the discovery rule does not apply to EFTA claims, *see, e.g.*, *Soileau*, 2020 WL 1304744, at \*4, Dr. Fagan's knowledge of any errors in his account directly impacted his ability to contact Nexo which, in turn, would trigger its obligation to investigate. The limitations clock, therefore, would not tick until ten days after that point. At bottom, to prevail on their limitations defense, Defendants have the burden to demonstrate that the limitations bar "clearly appears on the face of the complaint." *Bush v. United States*, 823 F.2d 909, 910 (5th Cir. 1987) (per curiam) (citing *Kaiser Aluminum's Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982), *cert. denied*, 459 U.S. 1105 (1983)). Defendants have not demonstrated that their proposed accrual dates are correct. Consequently, they have not carried their burden. Dr. Fagan's EFTA claim is not time-barred.

Shifting gears, the Court turns to Defendants' second EFTA challenge—that Nexo's behavior does not fall under the purview of the EFTA (Dkt. #6 at p. 29). Defendants claim that Dr. Fagan's allegation that an internal Nexo employee misappropriated his funds forecloses his EFTA claim. Indeed, as Dr. Fagan concedes, the EFTA's definition of "unauthorized fund transfer" does not include transfers initiated "[b]y the financial institution or its employee" (Dkt. #6 at p. 29; Dkt. #17 at p. 29) (quoting 12 C.F.R. § 1005.2(m)(3)). But as the Court has already explained, *see supra* Section IV.B, Dr. Fagan is permitted to plead in the alternative. *See, e.g.*, *True Believers Ink 2*, 2019 WL 4039888, at \*3; FED. R. CIV. P. 8(d). He did so here. If the evidence demonstrates that Nexo stole his funds, Dr. Fagan will pursue his theft claims. If, on the other hand, the evidence demonstrates that a third party stole his funds, he will pursue his EFTA claim. The mutual exclusivity of those alternative claims do not require dismissal at this stage.

The Court's remaining analysis on Dr. Fagan's EFTA claim groups together three of Defendants' arguments. Each falls under the same umbrella—whether Dr. Fagan's Nexo account, the EIP, or cryptocurrency in general are covered by the EFTA (Dkt. #6 at pp. 29–31). Defendants claim that they are not (Dkt. #6 at pp. 29–31). The Court begins with the broadest argument: the EFTA's treatment of cryptocurrency. Because the Fifth Circuit has not squarely addressed the issue, the Court looks out of circuit for guidance. The Southern District of New York has twice answered this question. *See Rider v. Uphold HQ Inc.*, 657 F. Supp. 3d 491 (S.D.N.Y. 2023); *Nero v. Uphold HQ Inc.* 688 F. Supp. 3d 134 (S.D.N.Y. 2023). The Court adopts the *Rider* and *Nero* analysis here because it finds it persuasive and detects no error.

In *Rider*, the Southern District of New York evaluated whether to dismiss a plaintiff's claim on the basis that cryptocurrency does not constitute a "fund" under the EFTA. *Rider*, 657 F. Supp. 3d at 497. The court began its analysis by recognizing that the EFTA leaves undefined the term "fund." *Id.* at 498. Accordingly, the court gave "fund" its ordinary meaning: "a sum of money or other liquid assets established for a specific purpose." *Id.* (quoting *Fund*, BLACK'S LAW DICTIONARY (11th ed. 2019)) (cleaned up). Then, the court compared that to the ordinary definition of "cryptocurrency": "a digital or virtual currency that is not issued by any central authority, is designated to function as a medium of exchange, and uses encryption technology to regulate the generation of units of currency, to verify fund transfers, and to prevent counterfeiting." *Id.* (quoting *Cryptocurrency*, BLACK'S LAW DICTIONARY (11th ed. 2019)) (cleaned up). The court concluded that "under its ordinary meaning, the term 'cryptocurrency' means a digital form of liquid, monetary assets that constitute 'funds' under the EFTA." *Id.* (citing *United States v. Iossifov*, 45 F.4th 899, 913–14 (6th Cir. 2022); *United States v. Day*, 700 F.3d 713, 725 (4th Cir. 2012)). Then,

in *Nero*, the same court clarified its position on the same question involving the same defendant. *Nero*, 688 F. Supp. 3d at 142. The court concluded that the EFTA's broad definition of "electronic fund transfer" contains no restriction that would exclude cryptocurrency. *Id.* On the contrary, the court noted that "cryptocurrency, like foreign fiat currency, can be represented in a U.S. Dollar amount using the currency's exchange rate." *Id.* Accordingly, the court concluded that the EFTA covers cryptocurrency to the same extent that it covers fiat currency. *See id.* The Court agrees with that conclusion. Cryptocurrency falls within the EFTA's definition of "fund."

That leaves the question of whether the EFTA covers the EIP or Dr. Fagan's Nexo account. The Court first considers the account. Again, *Nero* is instructive. There, like here, the question for the court was whether investment accounts escaped the EFTA's reach. *Id.* at 143. In answering that question, the court recalled the EFTA's definition of "account" as follows:

> A demand deposit, savings deposit, or other *asset account* (other than an occasional or incidental credit balance in an open end credit plan as defined in section 1602(i) [1] of this title), as described in regulations of the Bureau, *established primarily for personal, family, or household purposes*, but such term does not include an account held by a financial institution pursuant to a bona fide trust agreement.

*Id.* (quoting 15 U.S.C. § 1693a(2)) (emphasis in original) (cleaned up). Thus, the court added, the EFTA governs "any asset account established by a natural person for personal, family, or household purposes." *Id.* Though the court acknowledged that the EFTA does not define the phrase "personal, family, or household purposes," the court reasoned that a person establishes an account for "personal" purposes where they "establish[] the account for their individual or family use, as opposed to for a business or commercial endeavor," irrespective of any profit motive. *Id.* at 144. Accordingly, the court determined that the EFTA extended to investment accounts. *Id.* ("[P]ersonal asset accounts that are investment accounts like the money market mutual fund

accounts identified in the Senate Report or the cryptocurrency accounts at issue here, are accounts covered by the EFTA."). Again, the Court agrees. Dr. Fagan's account is covered by the EFTA.

Dr. Fagan also urges the Court to follow *Nero*'s analysis on the EFTA's securities exclusion and to hold that the EFTA governs Nexo's EIP. This is where his argument falls apart. The EFTA excludes from its coverage "any transaction the primary purpose of which is the purchase or sale of securities or commodities through a broker-dealer registered with or regulated by the Securities and Exchange Commission." 15 U.S.C. § 1693a(7)(C). The Southern District of New York's interpretation of the EFTA's securities exclusion focused on the term "transaction" in the Act's definition. *Nero*, 688 F. Supp. 3d at 144. The court noted that "[o]nly the transactions involving the purchase and sale of regulated securities are excluded; the asset accounts holding those investments are not excluded." *Id.* Dr. Fagan relies on that language to argue that "the SEC found that Nexo never filed a registration statement for the offer and sale of the EIP; therefore, the EIP was not sold through a 'broker-dealer registered with or regulated by the SEC'" (Dkt. #17 at p. 30 (quoting 15 U.S.C. § 1693a(7)(C)). But the *Nero* analysis does not apply to these facts. Indeed, *Nero* contemplated accounts comprised of numerous discrete transactions, any one of which may be subject to regulation by the SEC and, therefore, outside the confines of the EFTA. *See Nero*, 688 F. Supp. 3d at 144. In other words, the court concluded that the exclusion of a single transaction in an account does not take the entire account out of the EFTA's grasp. *See id.* Those are not these facts. Here, Dr. Fagan's EFTA claim is based on the EIP, and the EIP alone. His account *is* the transaction—there are no others to segregate from the EFTA's exclusion. Whether or not Nexo registered the EIP with the SEC is only half of the question under the EFTA. 15 U.S.C. § 1693a(7)(C) (excluding from the EFTA's coverage transactions involving "the purchase or sale

of securities or commodities through a broker-dealer registered with *or* regulated by the [SEC]")
(emphasis added). Despite Dr. Fagan's attempts to argue otherwise, the SEC regulated Nexo and
its offering of the EIP, as evidenced by its imposition of $22.5 million in fines upon Nexo and its
mandate that Nexo cease operations in the United States (*See, e.g.*, Dkt. #2 at ¶ 4). Accordingly,
though *Nero* is persuasive in the remainder of the Court's EFTA analysis, its examination of the
securities exclusion is distinguishable from these facts. Dr. Fagan's EFTA claim must be dismissed.

### F.    Dr. Fagan's Equitable Claims

The Court concludes its analysis by examining Dr. Fagan's equitable claims. Those are, his
claims for money had and received, unjust enrichment, and constructive trust (Dkt. #2 at pp. 32–
34). Defendants seek to dismiss those claims because (1) the parties' relationship is governed by
contract; (2) Dr. Fagan has an adequate remedy at law; and (3) certain equitable claims are not
stand-alone causes of action (Dkt. #6 at pp. 31–33). Defendants also reassert their objections to Dr.
Fagan's TTLA and conversion claims based upon the alleged lack of an identifiable *res* (Dkt. #6 at
p. 31). But the Court already concluded that Dr. Fagan has carried his pleading burden on his TTLA
and conversion claims. *See supra* Section IV.A. Thus, the Court's only task is to evaluate his
equitable claims.

The Court finds Defendants' first two arguments regarding the existence of a contract and
the availability of an alternative remedy unpersuasive. Defendants argue that the Earn Terms and
Service Terms govern this dispute and, therefore, Dr. Fagan's only recourse is to bring a claim
under those agreements (Dkt. #6 at pp. 31–32). Not so. Despite Defendants' attempts to persuade
the Court otherwise, Dr. Fagan disputes the enforceability of the Earn Terms and Service Terms
(Dkt. #2 at ¶¶ 28, 31, 33). Therefore, he seeks equitable relief in the absence of a governing
contract. He is permitted to do so. *See, e.g.*, *STP Invs. LLC v. NeoTek Energy, Inc.*, No.

422CV00361SDJCAN, 2023 WL 2606584, at *4 (E.D. Tex. Mar. 2, 2023), *report and recommendation adopted*, No. 4:22-CV-361-SDJ, 2023 WL 2601203 (E.D. Tex. Mar. 22, 2023) (collecting cases and refusing to dismiss unjust enrichment claim because the validity of the contract may be called into question later in the litigation); *Waller v. DB3 Holdings, Inc.*, No. 3:07-cv-0491, 2008 WL 373155, at *5 (N.D. Tex. Feb. 12, 2008) (acknowledging that since "it is possible that the contracts will later be held invalid . . . [i]t would . . . be premature to dismiss the unjust enrichment claim as being foreclosed by existing contracts"). Those alternative claims survive.

The only question that remains, then, is whether Dr. Fagan has cognizable causes of action for unjust enrichment and constructive trust. Texas law recognizes the former, not the latter. Indeed, the Texas Supreme Court has recognized an independent cause of action for unjust enrichment. *See, e.g.*, *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683–85 (Tex. 2000). Dr. Fagan has adequately pleaded that claim. The Court will not dismiss it. His claim for constructive trust, however, faces a different fate. Indeed, the Fifth Circuit has observed that "[a] constructive trust is not a cause of action under Texas law." *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010). Rather, it is "an equitable remedy used to prevent unjust enrichment." *Baxter v. PNC Bank Nat'l Ass'n*, 541 F. App'x 395, 398 (5th Cir. 2013) (per curiam) (internal citations omitted). Accordingly, because it is not a stand-alone claim, but a remedy actionable under an unjust enrichment theory, the Court does not treat Dr. Fagan's constructive trust claim as an independent cause of action. The Court dismisses Dr. Fagan's constructive trust claim to the extent that he asserts it as a cause of action, but he may still pursue that remedy through his surviving causes of action.

## CONCLUSION

The Court therefore **ORDERS** as follows:

1.    Defendant's Motion to Dismiss on *Forum Non Conveniens* Grounds or in the Alternative Motion to Transfer to the Northern District of Texas, Fort Worth Division, Pursuant to 28 U.S.C. § 1404 (Dkt. #5) is hereby **DENIED**; and

2.    Defendants' Motion to Dismiss Antoni Trenchev Pursuant to Rule 12(b)(2) and Motion to Dismiss Pursuant to Rule 12(b)(6) (Dkt. #6) is hereby **GRANTED in part** and **DENIED in part.** Specifically, the Court **ORDERS** as follows:

   a.    Dr. Fagan's EFTA claim is **DISMISSED with prejudice**; and

   b.    Dr. Fagan's constructive trust claim is **DISMISSED with prejudice**, although he may seek constructive trust as a remedy under his surviving claims.

**IT IS SO ORDERED.**

**SIGNED this 25th day of August, 2025.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE